## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| KING'S PEAK ENERGY, LLC, a Nevada | ) Case No. 17-16046 EEB |
| limited liability company, | ) |
| | ) Chapter 11 |
| Debtor. | ) |

**MOTION OF DEBTOR FOR ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING INCENTIVE COMPENSATION; (D) APPROVING BROKER COMPENSATION; AND (E) FOR RELATED RELIEF**

King's Peak Energy, LLC, through its counsel, Onsager | Fletcher | Johnson, LLC, files its Motion of Debtor for Order (A) Approving the Sale of Substantially all Debtor's Assets; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (C) Approving Incentive Compensation; (D) Approving Broker Compensation; and (E) for Related Relief (this "Motion"). In support of this Motion, Debtor states as follows:

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.

2.      The bases for the relief requested herein are Bankruptcy Code §§ 105(a), 363(b), 363(f), 363(m), 365(a), 365(b), 365(e), and 365(f), and Bankruptcy Rules 2002(a)(2), 2002(c)(1), 2002(d), 6004(a), 6004(c), 6004(f), 6004(h), 6006(a), 6006(d) and 9014.

## BACKGROUND

3.      King's Peak Energy, LLC ("Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code on June 29, 2017 (the "Petition Date") and is operating as debtor-in-possession under 11 U.S.C. § 1107. No party in interest has requested a

trustee or examiner under 11 U.S.C. § 1102, and a creditors committee has not been appointed in this case.

4.     Debtor is an independent energy company engaged in the exploration, development, production and sale of crude oil and natural gas in Wyoming and Utah. Debtor owns twelve (12) producing wells in five fields in Uinta County, Wyoming (the "Wyoming Field"). Debtor owns two (2) active wells in a single field in Summit County, Utah (the "Utah Field" and together with the Wyoming Field, the "Fields"). Debtor also has two (2) disposal wells in Utah.[1] The vast majority of the Fields are located on federal land, the lessors being governmental entities (including The United States of America Department of the Interior (BLM), U. S. Department of Agriculture (US Forest Service)[2] – hereinafter "Government Lessors").  The Fields are unitized. Debtor owns a Field-weighted average of approximately 96% of the working interests and has a Field-weighted average net revenue interest (after royalties and overrides) of approximately 79%.

**The Macquarie Bank Limited Credit Facility/Use of Cash Collateral/Necessity of Change of Operator**

5.     Debtor is a party to a Senior Secured Credit Agreement dated as of November 3, 2014 (as amended, restated or otherwise modified from time to time, the "Credit Facility") between the Debtor as Borrower and Macquarie Bank Ltd ("MBL").  As of June 17, 2017, Debtor was indebted to MBL in the principal amount of $18,588,079.76, plus interest in the amount of $144,284.71 (for a total of $18,732,364.47) and attorneys' fees and costs incurred prior to the Petition Date. The default interest rate triggered by the prepetition default of the Debtor is LIBOR plus 9.0%.  The Credit Facility is secured by substantially all of Debtor's assets, including the

---

[1] There are also approximately 14 inactive wells.
[2] The Wyoming Oil & Gas Conservation Commission is also a contract party to surface use agreements in Wyoming.

2

Fields, the proceeds of production produced by the Fields, the Field infrastructure and the cash collateral posted to secure the Debtor's bonding as required by the Government Lessors.

6.      MBL is the only party with an interest in cash collateral. The first interim order was entered after a first day hearing. MBL objected to certain provisions of the relief requested by Debtor, including without limitation Debtor's payment to Proven Petroleum, Inc. ("Proven"), then Debtor's operator of record under a contract operating agreement dated November 3, 2014 ("Proven Contract Operator Agreement").  As a result, the initial interim order provided for no payments to Proven under the Proven Contract Operating Agreement.

**Operations**

7.      In part because of MBL's long-standing dissatisfaction with the financial data provided by Proven in relation to Proven's operation of the Fields, MBL proposed and the Debtor agreed that the Debtor would retain a chief restructuring officer ("CRO") to oversee operations and the restructuring process.  The appointment of a CRO also resolved any possible conflict resulting from the involvement of Proven's president, John Teff, in the Debtor's affairs.

8.      Within the Stipulated Second Interim Order Authorizing Debtor's Use Of Cash Collateral [Docket no. 96], this Court approved the stipulation of MBL and the Debtor and ordered that "Debtor's right to use Cash Collateral pursuant to the terms of this Order shall terminate upon the earlier of (a) the failure of John Teff to submit his written resignation as president of the Debtor and as well any and all other managerial control or authority as to the Debtor before August 9, 2017, (b) the failure of the Debtor to move before August 16, 2017 for appointment of a Chief Restructuring Officer, acceptable to MBL, with delegated authority to oversee and pursue a sale process and/or to oversee the Debtor's reorganization efforts, if any, (c) the default by Debtor or

Proven under any terms of this order and (d) August 28, 2017. Debtor is not authorized to use Cash Collateral to pay for Forestry Service Bonds." [Docket no. 96, ¶10].[3]

9.　　On August 21, 2017, the Debtor filed its Application to Employ Chief Restructuring Officer [Docket no. 109] (the "Tiddens Application") to employ Mr. F. Robert Tiddens ("Mr. Tiddens") as chief restructuring officer. Mr. Tiddens commenced his duties (subject to Court approval) on or about August 28, 2017.[4]

10.　　Proven, as the operator of the Fields, was responsible for timely paying the field vendors and for keeping the Fields running. However, Proven did not pay the field vendors and as a result, around the last week of August, they stopped working. Consequently, Proven, with knowledge of the catastrophic consequences that could result from the Fields being shut in - particularly given the depth of the wells and the elevation of the Fields - allowed the Fields to be shut in during the week of August 28, 2017, without notice to Debtor. Debtor, Mr. Tiddens and MBL became aware of this on or about August 31 –September 1, 2017. Production ceased, and Debtor's assets were exposed to immediate harm, including permanent damage to field infrastructure and the threat of potential damage to Field infrastructure. As a result, Debtor terminated Proven as operator under the Proven Contract Operator Agreement on or about September 5, 2017.

11.　　Through the efforts of Mr. Tiddens, Debtor was able to make an analysis of possible contract operator candidates and contract structures (and associated costs) and determined, with the consent of MBL, that Debtor itself should replace Proven as operator of record of the Fields. Notably, Mr. Tiddens possesses the expertise and contacts with industry personnel that enabled him to quickly assemble a team of technical and professional personnel to assist the Debtor to

---

[3]　　MBL continued to object to the Debtor making bonding payments while Proven was operator of record.
[4] The Court approved the Tiddens Application on October 6, 2017, effective as of August 21, 2017. [Docket no. 180]

establish relations with (i) the governmental lessors, (ii) the field vendors (many whom had become dissatisfied with Proven's operation of the Fields), (iii) make plans to obtain regulatory approval and necessary vendor relationships to allow Debtor to reestablish production, and (iv) create a reliable financial and accounting system for Debtor's operations.

12.     To accomplish the task of changing operator of record status to Debtor, Mr. Tiddens and Debtor pursued a Rule 2004 process to recover the operational accounting database previously used by Proven.[5]   Mr. Tiddens navigated the regulatory process for change of operatorship, contracted for software, space, and independent contractors to perform the tasks required of the operator, and oversaw the field engineering. When Mr. Tiddens was appointed, the historical operating and financial data was incomplete and not readily accessible. Reliable historic data is essential to any plan process to create reliable projections. For the same reason, reliable historical information is essential to any sale process, as a buyer will otherwise significantly discount an offer for the risk that expenses will be materially higher than reported. Under Mr. Tiddens' guidance, the information was assembled.

13.     Further, Mr. Tiddens addressed a host of field operational issues.  Day to day operations and common well inspections had been neglected.  There were poor landowner relations and many concerns of the field vendors had been ignored. There were outstanding regulatory issues, such as the plugging and abandonment of a disposal well.  Mr. Tiddens and his team worked to stabilize operations after the shut-in of the Fields, including the matters described above, developing a critical path to bring the Fields back on line as soon as possible and to avoid any possibility of catastrophic damages to the Fields and individual wells.  By the end of December,

---

[5] All rights are reserved regarding funds still held by Proven that it has not provided sufficient account of or released to the Debtor as are all causes of action against Proven.

the current run rate for lease operating expenses could be counted on as a reliable measure of the cost of operating the Wyoming Field.

14.     In late September, again through the efforts of Mr. Tiddens, Debtor obtained regulatory approval from the applicable Wyoming federal and state agencies to become the operator of record, and the Wyoming Field was shortly thereafter placed back into production.

15.     The Utah BLM required a large increase in the operator's bond relating to the Utah Field before it would approve KPE as the operator. In addition, the U.S. Forest Service required an increase in the bond for surface access in the approximate amount of $1.4 million. In January 2018, on the basis of the efforts and representations of Mr. Tiddens, Debtor and MBL agreed to debtor-in-possession financing to fund both bond increases, and this Court approved the financing (the "DIP Facility") by order dated February 21, 2018 [Docket no. 252].  With funding of the bonds, Debtor was recognized as the operator of record and brought the Utah Field back into full production.  Currently the principal balance owed under the DIP Facility is $1,446,421.48, and accrued interest through May 8, 2018 is $2,700.23.  As set forth herein, the total balance due under the DIP Facility as of the date of closing of the sale ("DIP Facility Pay-off") will be paid to MBL at closing of the sale.

16.     After becoming the operator of record, Debtor, under the guidance of Mr. Tiddens, has been able to:  (i) establish a monthly lease operating expense run rate below that achieved under Proven; (ii) materially reduce non-recurring field expenses while increasing production from the Wyoming Filed; and (iii) obtain continued agreements with MBL for use of cash collateral which include authority for non-recurring lease operating expenses necessary to resolve operational, infrastructure, equipment and well condition problems;.  Under the direction of Mr. Tiddens, Debtor was able to rebuild its accounting system and provide reliable financial reporting.

Finally, Debtor, through the efforts of Mr. Tiddens, has established agreeable working relations with the Debtor's vendor creditors, has brought postpetition past-due amounts current and has maintain credit terms with at least of majority of Debtor's vendors. As a result, no creditors have filed any pleadings with the Court concerning non-payment of postpetition invoices or other matters. Additionally, Mr. Tiddens and his team smoothed over the rough spots that had previously existed with the regulators.

17.     Since the retention of Mr. Tiddens, Debtor and MBL have worked cooperatively to ensure that all field vendors are paid timely for any goods and services supplied after the Petition Date.

## SALE OR REORGANIZATION PLAN

18.     The CRO has evaluated various options that might be available for an exit from chapter 11, including a reorganization or a sale. Debtor does not believe it could obtain financing sufficient to pay MBL in full because such payment would require at greater than 100% financing, which is not available. The CRO also evaluated whether a plan of reorganization funded by operating income was likely to be feasible and concluded it was not. Debtor has determined that a Section 363 sale followed by a distribution plan is in the best interests of the estate and its creditors.

19.     Debtor assumes that MBL would oppose any cramdown plan, and many factors argue against a cramdown attempt.

20.     The first relates to the need to fund the Forest Service bonds of over $1.4 million. Current funding is provided by a DIP loan, approved by this Court, which is not susceptible of modification in a plan.  Third party non-consensual funding of these bonds (or, in other words, paying off the MBL DIP financing) is not feasible.  Debtor would need to obtain either a capital infusion or a replacement loan solely for the purposes of providing collateral to Government

Lessors.  It is not reasonable to expect a third-party lender, with no other interest in Debtor or its assets, to provide funding that could be drawn upon by Government Lessors in the event of an uncured environmental issue, just so that the lender could accrue interest when Debtor would be unable to provide the lender with an expected maturity date by which the bonds would have to be replaced by the Debtor.  Debtor sees no prospects for replacement bonding.

21.     The second roadblock is that MBL holds a recorded twenty percent (20%) net profits interest ("NPI") encumbering Debtor's assets.  Debtor's obligation to begin making payments under the NPI commenced when MBL accelerated Debtor's loan obligations. Debtor has no basis to argue that the NPI is avoidable. The 20% NPI reduces the possible return from Debtor's oil and gas assets to an extent that, as a practical matter, precludes any rational investor from investing: the NPI effectively reduces the value of Debtor's oil and gas assets by more than 20%.  However, to facilitate a 363 sale, MBL has agreed to release and cancel or if applicable convey to Debtor immediately prior to closing of the sale (without any warranty whatsoever) its NPI without further consideration, such that the NPI shall be included in Assets to be sold.

22.     The third roadblock is that MBL would oppose any cramdown process. As shown below, MBL has agreed that through a plan to be proposed in conjunction with the sale proposed herein, the Debtor can provide for payment of prepetition claims that are valid, non-subordinated, allowed and not precluded ("Vendor Claims"), notwithstanding that MBL will not be paid in full out of its collateral.[6]  As well, MBL has consented to the continued use of cash collateral, to payment for administrative expenses approved as part of the cash collateral budgets, and as may have to be paid as a condition to confirmation, and to the carve out from sale proceeds as discussed below for CRO and other compensation/sales commission.  Any cram down attempt would risk

---

[6]     This group does not include Proven.

payment to MBL, prevent satisfaction of the Vendor Claims, and likely would generate the request for the appointment of a trustee and/or conversion to chapter 7.

23.     Prior to filing its Petition, Debtor had engaged Bay Capital Corporation to market its assets.  However, given the absence of reliable financial data, the inattention to operations of the Fields, the uncertainty of the bonding situation and the problematic association of Proven (the owner of which was overseeing the marketing process in his capacity as president of the Debtor, while at the same time reviewing all prospective bids despite the fact that Proven was as well a bidder – a classic conflict of interest), it is clear to Debtor and Mr. Tiddens that the pre-bankruptcy marketing process was fundamentally flawed.  The marketing did result in bidding, but as the highest bid was materially superior to the bid made by Proven, it is no surprise that the marketing process stalled, the Debtor never completed negotiating a purchase agreement and in essence the marketing process dissolved.

24.     Under the order approving his retention as CRO, Mr. Tiddens is vested with authority to "pursue and oversee a sale process for Debtor's assets if Mr. Tiddens determines it is in the best interests of the estate." [Docket no. 180]. In order to determine if a sale was in the best interests of the estate, Mr. Tiddens, shortly after his retention, began discussions with potentially-interested parties about a possible sale, including parties who had expressed interest during the prior sale effort. He also received unsolicited offers for the Debtor's assets. He provided extensive information that Debtor believes (now) is valid.  He has overseen an overhaul of the Fields to both restore production and to perform long overdue maintenance and capital projects designed to maximize both the current production of the Fields and best insure extended life of the Fields.  The sale process undertaken by Mr. Tiddens has been a market process designed to convey both the current Field status and production achievable, as well as future prospects.  He has overseen the

construction of a virtual data room and the collection of the due diligence information that is both in the data room and available through Debtor to any inquiring prospective buyer.  His experience and expertise in the industry has generated a presumption of reliability, in the Debtor's opinion, and has enabled the Debtor to present to the universe of potential purchasers the actual value and condition of the Fields and the Debtor's assets (along with the lease operating expenses that are achievable, the capital expenditures that should be projected, stable vendor relations, and accurate equipment assessments).

**Headwaters/DTE Transaction**

25.     Extensive negotiations with Headwaters E&P, LLC[7] ("Headwaters") over the past several months have culminated in an agreement to purchase the Assets that Mr. Tiddens has determined represents the highest reasonably attainable, while at the same time preserving the prospect of higher offers up to the entry of an order granting this Motion.

26.     In January 2018, Debtor and Headwaters entered into a letter of intent.   In consideration of the offer amount, Debtor agreed to a "window-shop" clause.

27.     Debtor and Headwaters subsequently negotiated a purchase and sale agreement, an executed copy of which is attached as **Exhibit A** (the "PSA").  The actual purchasing party is DTE O&G LLC ("DTE")[8], the assignee of Headwaters. The Debtor seeks approval to close a sale under and in conformity with the PSA (the "Sale").

28.     In addition, Debtor retained Meagher Energy Advisors ("MEA") as its broker. MEA is a long-standing and highly respected broker of oil and gas properties. As to Headwaters/DTE, MEA's role is to advise Debtor concerning price and other terms, assist with due diligence issues and prepare a reserve report. In this role, it has assisted in preparing a due

---

[7] Headwaters is a Texas limited liability company doing business in San Antonio, Texas.
[8] DTE is a Delaware limited liability company also doing business in San Antonio, Texas.

diligence data room that would be available should a wider sales process be required (upon execution by such parties of a customary non-disclosure agreement). To ensure that other potentially interested parties have access to information regarding the Assets, the same materials making up the data room are available through Debtor.

## ASSETS TO BE SOLD

29.     Debtor's Fields are located in Uinta County, Wyoming and Summit County, Utah[9] and, along with related equipment and infrastructure, comprise substantially all of Debtor's assets. Under the PSA the Assets to be sold are generally described as follows:

(a)     all of (i) the oil and gas Leases[10], Lands and Units described in Section 1.2(a) of the PSA and Exhibit A thereto, and (ii) all unit interests, net profits interests (including, as applicable and without any warranty whatsoever, the NPI)[11], overriding royalty interests, all mineral owned in fee and seismic data, as described in Section 1.2(a) of the PSA.

(b)     all oil, gas water or injection Wells located on the Lands, as described in Section 1.2(b) of the PSA and Exhibit A-1 thereto;

(c)     the pools or units which include any Lands, Leases or Wells, as described in Section 1.2(c) of the PSA and Exhibit A-1 thereto;

(d)     all contracts and agreements, other than Leases and Surface Contracts, which relate to the Assets, as described in Section 1.2(d) of the PSA and Schedule 1.2(d) thereto;

(e)     all easements, permits and other surface contracts pertaining to the Lands, as described in Section 1.2(e) of the PSA and Schedule 1.2(e) thereto;

---

[9] The legal description of the real estate is contained in Exhibit A and Exhibit A-1 of the PSA.
[10] All capitalized terms not defined in this Motion shall have the meaning set forth in the PSA.
[11] Included as an Asset since it may be conveyed to Debtor by MBL immediately prior to the closing of the sale in connection with the cancellation of the NPI.

(f)      the equipment, machinery, vehicles, fixtures, and other tangible personal property and improvements located on the Lands, as described in Section 1.2(f) of the PSA and Exhibit A-2 thereto;

(g)      all flow lines, pipelines, gathering systems and appurtenances thereto located on the Lands, as described in Section 1.2(g) of the PSA and Schedule 1.2(g) thereto;

(h)      all facilities used or held for use primarily in connection with operation of the properties including water injection facilities and power generation facilities, as described in Section 1.2(h) of the PSA;

(i)      all Hydrocarbons produced from or attributable to the Leases, Lands and Wells after the Effective Time, as described in Section 1.2(i) of the PSA; and

(j)      Records relating to the foregoing, as described in Section 1.2(j) of the PSA.

Certain property which may be associated with the Assets is excluded from the sale, as identified in the PSA on Exhibit B thereto.

## SUMMARY OF PSA AND TERMS HIGHLIGHTED PURSUANT TO LBR 6004-1(d)

30.      The material terms of the PSA and the proposed order approving the sale (the "Sale Order") are as follows:

a.      <u>Purchase Price</u>: The Purchase Price for the Assets is $17,500,000 (*PSA §2.1*), subject to certain adjustments (*PSA §2.2*). Additionally, DTE is to replace all bonding (*PSA §12.5*), which shall have the effect that all bonding collateral will be remitted to the Debtor subject to interests and liens, particularly the MBL liens upon the bonding cash collateral.[12]

---

[12]      As well, MBL at closing of the sale will receive full payment of the DIP facility ("DIP Facility Pay-off").

b.      Agreements with Management (6004-1(d)(A)): DTE has no agreements with management of Debtor. As part of this Motion, Debtor seeks approval of certain incentive compensation to Mr. Tiddens that MBL has agreed to, which is discussed below.

c.      Releases (6004-1(d)(B)): No claims are waived, released or otherwise satisfied. The purchase and sale agreement limits damages to the amount of the earnest money deposit (*PSA §10.4*).

d.      Private Sale/No Competitive Bidding (6004-1(d)(C)): An auction is not contemplated. Debtor has agreed not to solicit or initiate discussions regarding a competing offer; however, the PSA does not prohibit Debtor from pursuing another transaction provided that the counterparty to the transaction initiates the discussions with Debtor without any solicitation by Debtor. (*PSA §4.3(d)*). While the virtual data room maintained by MEA is not open, a duplicate of all information in the data room is available to all inquiring parties through Debtor.

The justifications for not holding an auction include the following:

(i)      The Purchase Price is the subject of arm's-length negotiation with Headwaters/DTE and is considered significantly more monetization than any previous written or verbal offer. This conclusion is supported by Mr. Tiddens, who has decades of experience in the purchase and sale of oil and gas properties, and by MEA. In this regard, it should be noted that MEA would earn a higher commission if it is required to market the Assets, even if the resulting price were lower. Both the opinions of Mr. Tiddens and MEA are supported by the recently completed reserve report. The more favorable price is in part consideration for a more limited marketing effort.

(ii)     MBL is in favor of the DTE sale and opposed to an auction process unless necessary. The prepetition balance due to MBL is currently more than $18,732,000, subject to

increase under § 506(b) for postpetition interest, attorneys' fees, and other costs to which MBL would be entitled out of any additional sale proceeds (currently the prepetition claim plus postpetition interest, without the addition of pre-or postpetition attorneys' fees and costs would amount to $20,448,245.94). Additionally, MBL is owed the DIP Facility Pay-off amount of $1,446,421.48), to be paid off at closing of the Sale. The sale of the Assets would also have to net several hundreds of thousands of dollars above the MBL pre-and postpetition claims (without even considering the DIP facility amount) to cover the MEA sale commission before any other creditor would benefit. To generate proceeds sufficient to pay all allowed Vendor Claims, plus the amounts due MBL and administrative claimants, the Assets would have to sell for a price greater than $23 million (roughly calculated). Both Mr. Tiddens and MEA estimate that a price at this level is not achievable. In addition, any buyer will be required to post about $3 million in bonds. In the circumstances faced by the Debtor (with the plan structure mentioned herein that will allow payment of Vendor Claims), the only party that could benefit from an auction process is MBL, and MBL favors the sale process proposed herein, with no auction.

If, however, a better offer surfaces prior to approval of the DTE sale, Debtor is not restricted from accepting it, but will be required to pay DTE a break-up fee if the alternate sale closes,[13] since DTE would then have effectively operated as a "stalking horse." (*PSA §4.4*).

e.    Closing and Other Deadlines (6004-1(d) (D)):  The Closing of the transaction must occur no later than 30 days after entry of the Sale Order. (*PSA §9.1(a)*) The Deposit must be delivered within five (5) Business Days of the execution of the PSA. (*PSA §2.4*).  DTE has 20 days after the date upon which the Sale Order is entered during which to complete its due diligence

---

[13] Authority to pay the break-up fee is the subject of a separate motion.

investigation. (*PSA §1.6*). DTE has until seven (7) Business Days after the end of the Due Diligence Period to deliver a Defect Notice to Debtor. (*PSA § 1.6*)

  f. <u>Good Faith Deposit</u> (6004-1((d)(E)): DTE has made an earnest money deposit of $850,000 as required by the PSA (*PSA §2.4*), being 5% of the Purchase Price. DTE will forfeit the Deposit if the transaction fails to close, in accordance with the terms of the PSA.  If Seller terminates the PSA because Purchaser has failed to comply with any provision of Section 8.1 of the PSA or as the result of any default or breach by Purchaser of Purchaser's obligations thereunder, then Seller may retain the Deposit as liquidated damages. (*PSA §10.3(a)*).

  g. <u>Interim Arrangements</u> (6004-1(d)(F)): Not applicable.

  h. <u>Use of Proceeds</u> (6004-1(d)(G)): Not applicable. All sale proceeds, except for customary closing costs, accrued and unpaid post-petition taxes owed by the Debtor under the PSA, Mr. Tiddens' approved compensation and MEA's commission, will be distributed under a plan of reorganization.  The DIP Facility Pay-off will be made at closing as well.

  i. <u>Tax Exemption</u> (6004-1(d) (H)): Not applicable.

  j. <u>Record Retention</u> (6004-1(d)(I)): Debtor will have reasonable post-sale access to the books and records that it will require in order to administer the remainder of its bankruptcy case and its wind down under a plan, as well as perform any post-closing obligations. (*PSA §1.2(j)*)

  k. <u>Sale of Avoidance Actions</u> (6004-1(d)(J)): Not applicable.

  l. <u>Requested Findings as to Successor Liability</u> (6004-1(d)(K)): Successor liability limitations conforming to and based upon relief previously granted by this Court are sought. Debtor seeks provision in the Sale Order whereby DTE is not and shall not be deemed a "successor" to the Debtor or its estate as a result of the consummation of the Sale or the Sale Order, and, except for obligations or liabilities expressly assumed in the PSA or the Sale Order (if any),

DTE shall not assume, nor be deemed to assume, or in any way be responsible for any obligation or liability of any of the Debtor and/or its estate including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtor or against an insider of the Debtor, or similar liability and that this Sale Motion contains sufficient notice of such limitation in accordance with Rule 6004-1 of the Local Bankruptcy Rules. The purchase of the Assets by DTE and the transactions approved by the Sale order will not cause DTE to be deemed a successor in any respect to the Debtor. In the event that DTE is treated as a successor employer under section 3121(a)(1) of the Internal Revenue Code, DTE shall not by reason of any such treatment be deemed to have assumed any liabilities or to be a successor for any other purpose. (*Proposed Sale Order ¶ 15*)

      m.    <u>Sale Free and Clear of Unexpired Leases</u> (6004-1(d)(L)): Not applicable.

      n.    <u>Credit Bid</u> (6004-1(d)(M)): Not applicable.

      o.    <u>Relief from Fed. R. Bankr. P. 6004(h)</u> (6004-1(d)(N)): As requested later in this Motion, the proposed Sale Order contains a provision that such order will become effective immediately upon entry pursuant to Bankruptcy Rules 6004(h) and 6006(d), rather than being stayed until the entry of 14 days after the entry of the Sale Order. (*Proposed Sale Order ¶ 31*) While Section 9.1(a) of the PSA allows for Closing 30 days after entry of the Sale Order, the parties wish to close as quickly as possible and thus desire that the Sale Order be a final order. The Debtor believes that it will be able to resolve all potential objections prior to the Sale Hearing and thus the potential for an actual appeal will be minimized.  This belief and the need for a prompt closing constitute good cause for a waiver of Fed. R. Bankr. P. 6004(h).

      p.    <u>Contracts and Leases</u>. Debtor will assume and assign certain executory contracts and unexpired leases pursuant to a Designation Notice to be delivered by Purchaser (the

"Purchased Contracts"). (*PSA §4.4*); (*Proposed Sale Order* ¶ 10). Debtor is not aware of any cure amounts or other defaults under any possible Purchased Contract.

      q.    <u>Finding of Good Faith Purchaser</u>. As requested later in this Motion (and as per the PSA), the proposed Sale Order contains a provision that DTE is a good faith purchaser under § 363(m) of the Bankruptcy Code. (*PSA §4.2; Proposed Sale Order* ¶¶ J; 18). The PSA was negotiated in good faith at arms' length by all parties, without collusion or fraud of any kind. Debtor is unaware of any connections between Headwaters/DTE and Debtor or any other party involved in the sale process. Debtor is unaware of any conduct by Headwaters/DTE that would prevent the application of § 363(m) of the Bankruptcy Code.

## HOLDERS OF PREFERENTIAL PURCHASE RIGHTS

31.    Debtor is unaware of any holder of a preferential purchase right that applies to the sale.

## SALE FREE AND CLEAR OF LIENS

32.    The title to Assets are being sold subject to the following Interests (called "Permitted Encumbrances" in the PSA):

      a.    Royalties and overriding royalties, reversionary interests and other burdens of record at the Effective Time, except for the NPI;

      b.    All leases, unit agreements, pooling agreements, operating agreements, Hydrocarbon production sales contracts, division orders and other contracts, agreements and instruments applicable to the Assets;

      c.    Transfer Requirements applicable to the Assets;

d.      Liens for current Taxes or assessments not yet delinquent (or, if delinquent, (i) being contested in good faith by appropriate actions, or (ii) which will attach to the sale proceeds at Closing pursuant to the Sale Order);[14]

e.      Materialman's, mechanic's, repairman's, employee's, contractor's, operator's and other similar liens or charges arising in the ordinary course of business for amounts not yet delinquent (including any amounts being withheld as provided by Law), or, if delinquent, (i) being contested in good faith by appropriate actions, or (ii) which will attach to the sale proceeds at closing pursuant to the Sale Order;[15]

f.      Rights of reassignment arising upon final intention to abandon or release the Assets, or any of them;

g.      Easements, rights-of-way, servitudes, permits, surface leases and other rights in respect of surface operations;

h.      All rights reserved to or vested in any Governmental Body to control or regulate any of the Assets in any manner and all obligations and duties under all applicable Laws, or under any franchise, grant, license or permit issued by any such Governmental Body;

i.      Any encumbrance on or affecting the Assets which DTE expressly assumes, bonds or pays at or prior to Closing or which is to be and is discharged at or prior to Closing;

j.      Calls on Hydrocarbon production under existing Contracts;[16]

k.      Any other liens, charges, encumbrances, defects or irregularities which do not, individually or in the aggregate, materially interfere with the use or ownership of the Assets

---

[14] DTE is not substantively assuming obligations to pay liens that will attach to the proceeds from the sale. It is only agreeing that such liens will not be considered title defects.

[15] DTE is not substantively assuming liabilities to pay liens that will attach to the proceeds from the sale. It is only agreeing that such liens will not be title defects.

[16] The parties do not believe any such calls exist. To the extent they do exist they would not be considered title defects. This does not mean that DTE is substantively assuming such obligations.

subject thereto or affected thereby (as currently used or owned), which would be accepted by a reasonably prudent purchaser engaged in the business of owning and operating oil and gas properties; and

l.      Liens granted under applicable joint or unit operating agreements.

33.      Other than Permitted Liens, there are three categories of lienholders: MBL; holders of alleged well liens; and taxing authorities. The sale proceeds will be sufficient to pay in full holders of alleged well liens (whose claims are Vendor Claims) and the liens securing any past due taxes actually owed by the Debtor,[17] and the proposed sale order provides for such liens to attach to the sale proceeds pursuant to Section § 363(f)(3) of the Bankruptcy Code. Debtor does not propose to sell the Assets free and clear of the lien for taxes not yet due and payable. As to the lien of MBL, MBL consents to the sale, and to the attachment of its lien rights securing the prepetition claim of MBL under the Credit Facility (exclusive of the amounts due under the MBL DIP facility, which are to be paid at Closing) to the sale proceeds pursuant to § 363(f)(2) of the Bankruptcy Code. All purported lienholders are identified on the attached **Exhibit B**, together with the alleged amounts due.

## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

34.      Debtor also seeks approval of the assumption and assignment of the Purchased Contracts pursuant to § 365(f) of the Bankruptcy Code in connection with the sale. Attached hereto as **Exhibit C** is a list of all Purchased Contracts which identifies: (a) the executory contracts and unexpired leases that *may be* assumed and assigned to the Purchaser; (b) the name and address of the contract counterparties thereto; (c) the earliest proposed effective date of the assignment

---

[17] The Debtor and MBL reserve all rights regarding any funds still held by Proven, including without limitation those funds held by Proven or that the Debtor intended for Proven to hold in escrow for property or other taxes, and expressly reserve all causes of action against Proven.

(subject to the right of Debtor and Purchaser to either (i) withdraw such request for assumption and assignment of any Purchased Contract prior to the Closing or (ii) otherwise extend such effective date); and (d) Debtor's determination of the amount, if any, necessary to be paid to cure any existing default in accordance with §§ 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"); provided that the listing of any executory contract or unexpired lease on Exhibit C does not constitute a binding determination to assume or assign such executory contract or unexpired lease. Debtor has served this Motion and the 9013 Notice on all such contract counterparties to a Purchased Contract

## LEGAL AUTHORITY

### A.   The Court Should Authorize the Private Sale of Debtor's Assets

35.   A debtor in possession has "ample discretion to administer the estate, including authority to conduct public or private sales of estate property." *In re Psychometric Sys, Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (Brown, J.) quoting *In re Bakilis*, 220 B.R. 525, 532 (E.D.N.Y. 1998). The authority to sell assets conferred upon a debtor by section 363(b) "include[s] a sale of substantially all the assets of an estate." *Otto Preminger Films, Ltd, v. Qintex Entertainment, Inc. (In re Qintex Entertain'p'ment, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991). Likewise, bankruptcy courts are given a great deal of discretion when deciding whether to authorize a sale of a debtor's assets outside of the ordinary course of business.  *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992).  A sale should be authorized if the debtor-in-possession demonstrates the proposed sale reflects sound business judgment. *See Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Castre*, Inc., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *see also*, *In re Thomson*

*McKinnon Secs., Inc.*, 120 B.R. 301, 307 (Bankr. S.D.N.Y. 1990); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).

36.    Courts consider the following factors in determining whether the debtor-in-possession has exercised proper business judgment: (1) any improper or bad motive; (2) whether the price is fair and the negotiations or bidding occurred at arm's length; and (3) the adequacy of the sale procedures. *In re Castre*, Inc., 312 B.R. at 428. As demonstrated below, Debtor has properly exercised its business judgment for the proposed sales.

37.    After careful evaluation, the CRO has determined a plan of reorganization would be difficult to confirm over the objection of MBL. MBL has indicated it does not favor a plan except in connection with a sale.

38.    The CRO has also determined, after investigation, that the price to be paid by DTE is a favorable one, and that a more extensive sale process, which could cause DTE to withdraw as a bidder, may not yield as good a price. Further, the price is acceptable to MBL, and MBL, in return for the certainty of a sale, has agreed to various payments from its collateral for the benefit of the estate and other creditors. In all events, the Fields are highly unlikely to sell for a price, when combined with Debtor's other realizable assets (namely, its bond deposits), that would be high enough to satisfy the lien of MBL plus the payments to be made through the closing and plan process from MBL collateral.  As a result and as discussed above, a more extensive sale process, even if it produced a higher offer, will not benefit the estate or its creditors, with the possible exception of MBL, and MBL favors the Sale proposed by this Sale Motion.

39.    Based upon the foregoing, the sale of the Assets is in the best interests of Debtor, its estate, and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval.

**B.     The Court Should Authorize the Sale of the Assets Free and Clear of All Interests Pursuant to § 363(f) of the Bankruptcy Code**

40.     Debtor seeks to sell Debtor's assets free and clear of all liens, claims, encumbrances, and other interests pursuant to § 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of any interest in such property if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

41.     Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements is sufficient to permit the sale of Debtor's assets "free and clear" of liens and interests. *Mich. Empl. Sec. Comm'n v. Wolverine Radio Co*. (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991); see also *In re Kelistrom Indus., Inc*., 282 B.R. 787, 793 (Bankr. D. Del. 2002).

42.     As previously stated, other than Permitted Liens, there are three categories of lienholders which are described on Exhibit B: MBL; holders of alleged well liens; and taxing authorities. There will be sufficient sale proceeds to pay the holders of the alleged Wells liens and taxing authorities in full, and the liens will attach to the sale proceeds pursuant to § 363(f)(3) of the Bankruptcy Code. As to the lien of MBL, MBL consents to the sale, with its lien to attach to the sale proceeds pursuant to § 363(f)(2) of the Bankruptcy Code.

**C.     The Court Should Grant Purchaser the Protections Afforded a Good Faith Purchaser under § 363(m) of the Code**

43.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). A good faith purchaser is one who purchases in "good faith" and for "value." *In re Bel Air Associates, Ltd*., 706 F.2d 301, 305 n.12 (l0th Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc*. 788 F.2d 143 (3rd Cir. 1986). To constitute a lack of good faith, a party's conduct in connection with the sale usually must amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders or the trustee." *In re Crowder*, 314 B.R. 445, 450 (B.A.P. 10th Cir. 2004).

44.     In this case, the PSA was negotiated by all parties in good faith at arms' length, without collusion or fraud of any kind. Debtor is unaware of any connections between Headwaters/DTE and Debtor or any other party involved in the sale process. Debtor is unaware of any conduct by Headwaters/DTE that would prevent the application of § 363(m) of the Bankruptcy Code. Debtor anticipates making the appropriate showing at a hearing that Headwaters/DTE and all parties have acted in good faith and otherwise in accordance with the statutory standards.

**D.      Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Authorized under the Bankruptcy Code**

45.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., *In re Grayhall Res., Inc*., 63 B.R. 382,384 (Bankr. D. Colo. 1986). In this case, the assumption and

assignment of the selected executory contracts is a necessary and integral part of the Sale of Debtor's assets.

46.     Pursuant to § 365(b)(I) of the Bankruptcy Code, a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. 365(b)(I). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.

47.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract … only if the trustee assumes such contract … and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). Adequate assurance of future performance is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re Colorado Sun Oil Processing LLC*, No. BR 10-24424-SBB, 2011 WL 3585565, at *12 n.74 (Bankr. D. Colo. Aug. 12, 2011) (citing *In re Bon Ton Restaurant & Pastry Shop, Inc*., 53 B.R. 789 (Bankr. N.D. Ill. 1985).

48.     All counterparties to executory contracts and unexpired leases that Debtor might seek to assume and assign have been served with of this Motion.

## **PAYMENT OF BROKER**

49.     Pursuant to the order approving the employment of MEA [Docket no. 291] (the "MEA Approval Order"), the Court authorized Debtor to employ MEA as its broker pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code in accordance with the terms of the Engagement Letter attached to the motion. The Court also approved the terms of MEA's compensation set forth in the Engagement Letter.

50.     Per paragraph 7(f) of the Engagement Letter (a copy of which is attached hereto as **Exhibit D**), MEA's commission is payable on a sliding scale depending on the sale price, ranging from 1% to 6% of the total amount, as follows:

| Commission | Cumulative Sales |
|---|---|
| 6% | $1.00 to $1,000,000 plus; |
| 5% | $1,000,001 to $2,000,000 plus; |
| 4% | $2,000,001 to $3,000,000 plus; |
| 3% | $3,000,001 to $4,000,000 plus; |
| 2% | $4,000,001 to $5,000,000 plus; |
| 1% | $5,000,001 and above |
| The minimum collective Commission is $200,000.00. | |

51.     However, the Engagement Letter further states that if a sale is consummated with Headwaters[18] prior to MEA's mailing of an offering memorandum to MEA's database of potential buyers, the commission shall be reduced by 50%.

52.     MEA did not mail an offering memorandum. Thus, the commission payable to MEA is $200,000[19] (the "Commission").

53.     Pursuant to the MEA Approval Order, Debtor is required to request authority to pay MEA in this Motion.[20] Debtor requests (a) authorization to pay MEA the Commission upon the Closing of the sale, and (b) final allowance of the engagement fee of $50,000,[21] being the amount previously paid to MEA pursuant to paragraph 7(e) of the Engagement Agreement.

---

[18] DTE, being the assignee of Headwaters, is covered under this provision.

[19] Given a purchase price of $17,500,000, MEA's fee would ordinarily be $325,000.  One-half of this amount is $162,500, with a minimum commission payable of $200,000.

[20] If no sale occurs, MEA shall file a final fee application for the allowance of compensation for services rendered as per the MEA Approval Order.

[21] This amount is not credited against the Commission. The engagement fee has paid for items such as the Virtual Data room, reserve report and other sundry items.

## INCENTIVE COMPENSATION MR. TIDDENS

54.     Closing of the sale and receipt of the sale proceeds will not provide sufficient funds to Debtor with which to pay the MBL debt in full.  Notwithstanding this fact, Debtor proposes, and MBL has agreed, that Mr. Tiddens, at Closing, be paid an incentive fee ("Tiddens Sale Fee"), and Debtor (along with MBL) seeks approval of the Tiddens Sale Fee within the Sale Order.

55.     The efforts of Mr. Tiddens and the results achieved by him while working as CRO (from the date of filing of the Tiddens Application).  The accomplishment of the results by the Debtor under the guidance and direction of Mr. Tiddens could not have been foreseen given this Debtor's history.  The Debtor submits that the sale process could not have occurred without Mr. Tiddens and, as well, that without him the chapter 11 process would have been fraught with adversarial proceedings.

56.     Mr. Tiddens has overseen the change of operatorship, been the integral component in consensual relations with MBL, has conducted (and is still conducting) an overhaul of the Fields (with performance of much deferred maintenance, workovers to increase production, etc.).  He has efficiently dealt with federal lessors and bonding issues, created the systems necessary to generate accurate and reliable financial and operational information, has been the Debtor's representative to oversee the communications with prospective purchasers regarding the Assets and operations, has acted in his role without conflict of interest, and, overall, has created the market for the Debtor's Assets that was not created before commencement of his work for the Debtor.

57.     The Tiddens Sale Fee, to be paid upon Closing, is $600,000.00, assuming (i) the Closing of the sale and (ii) any Sale price reductions contemplated in and by the PSA being acceptable to MBL.  This amount, assuming receipt of the $17,500,000 Purchase Price would be 3.42857% thereof, which is a reasonable figure and has been approved by the Debtor and MBL.

58.     As shown in the Sale Order, Debtor seeks approval of the Tiddens Sale Fee therein. As mentioned, MBL is the only party affected by the Tiddens Sale Fee and has approved it.

## NOTICE

59.     Debtor has served this Motion on (a) the Office of the United States Trustee; (b) the twenty largest creditors; (c) all parties who are known to assert liens with respect to the Assets; (d) all parties who have timely filed a request for notice under Bankruptcy Rule 2002; (e) all governmental agencies including the United States Office of Natural Resources Revenues, the United States Forestry Service and any state or federal agencies that must approve a change of ownership or operator for the Fields; (f) all counterparties to executory contracts and unexpired leases that Debtor might seek to assume and assign; and (g) all parties who have expressed an interest in the possible purchase of the Assets. As well, Notice of this Motion has been provided to all creditors and other parties in interest.

## IMMEDIATE EFFECT

60.     Debtor requests that the order approving this Motion become effective immediately upon entry pursuant to Bankruptcy Rules 6004(h) and 6006(d).  The PSA requires Closing within 30 days after entry of the Sale Order, but the parties seek the abrogation of the stay provided for by Bankruptcy Rules 6004(h) and 6006(d) so that they can be free to effect Closing on an earlier date.

WHEREFORE, Debtor respectfully requests that this Court enter an order granting this Motion and approving the Sale as requested herein and granting such other relief as is just and proper.

Dated: May 9, 2018                    Respectfully submitted,

                                      **ONSAGER | FLETCHER | JOHNSON**

                                      *s/ Christian C. Onsager*
                                           Christian C. Onsager, #6889
                                           Alice A. White, #14537
                                      1801 Broadway, Suite 900
                                      Denver, Colorado 80202
                                      Ph: (303) 512-1123
                                      Fax: (303) 512-1129
                                      consager@OFJlaw.com
                                      awhite@OFJlaw.com

                                      *Attorneys for Debtor*